# CIRCUIT COURT OF ROCKINGHAM COUNTY

Eugene Huffman,
Executor of the
Estate of William Parker,
deceased

v.

Beverly California Corp.,
Beverly Enterprises, Inc.,
Liberty Nursing Homes, Inc.,
d/b/a Liberty House
Nursing Home,
and Michael Spitzer

April 22, 1997

Case No. (Law) 9734

BY JUDGE JOHN J. MCGRATH, JR.

This case was brought by the plaintiff, Eugene Huffman, as the Executor of his father-in-law, William Parker, against the corporate defendants who collectively operated the Liberty House Nursing Home in Harrisonburg,

Virginia, and one of its former employees, Michael Spitzer. The suit alleges, *inter alia,* that the late Mr. Parker had been injured because of defendants' providing inadequate and inappropriate care for Mr. Parker while he was a resident of the nursing home from August 22, 1991, to March 4-6, 1992.

Included in the allegations of improper care were assertions that the defendant, Michael Spitzer, while acting within the scope of his employment and providing geriatric nursing care to Mr. Parker (who was eighty years old) sexually molested Mr. Parker on numerous occasions, physically assaulted Mr. Parker, and generally treated him in a demeaning fashion. The sexual abuse allegations relating to Mr. Parker's stay at Liberty House included allegations that he was anally raped, that the nursing aid, Spitzer, masturbated upon Mr. Parker and forced Mr. Parker to engage in acts of oral sodomy upon Spitzer. The suit also alleged that Spitzer stuffed food in Mr. Parker's mouth in an inappropriate fashion, cut Mr. Parker numerous times with a razor, and impermissibly restrained him in his bed and in his Gerri-chair.

Liability of the corporate defendants was premised upon their providing a generally inadequately staffed facility and improperly training their personnel, the improper and excessive use of physical restraints, permitting Mr. Parker to roam and to escape from the facility without having proper safeguards, their alteration of nursing records, and in their negligent hiring and retaining of Michael Spitzer. The Plaintiff asserted that the corporate defendants had violated industry norms in failing to check any references before Spitzer was hired and therefore failed to discover that Mr. Spitzer was terminated from his previous employment for inappropriate conduct with patients and fellow workers and that the corporate defendants retained Mr. Spitzer on their payroll after they had become aware that he had sexually assaulted other patients and engaged in other inappropriate and bizarre conduct while on duty at Liberty House.

After a six-day jury trial, the jury returned with a joint and several verdict against all of the defendants for $518,000.00 in compensatory damages and $4.5 million dollars in punitive damages. After the verdict was returned and the jury polled, the jury was discharged.

The Defendants have filed a broad based and comprehensive Motion to Set Aside the Verdict on nine separate grounds. In turn, the plaintiff has filed a Motion for an allowance of attorneys' fees based upon the contractual provision providing that attorneys' fees shall be awarded to the prevailing party of any action which was brought to enforce the contract entered into between the corporate defendants and Mr. Parker. The Defendants have opposed this request for attorneys' fees on the ground that (a) the contract action should never have been permitted to go to the jury in the first place, and

(b) even if the contract action was properly before the jury, the reasonable amount of attorneys' fees is a jury question and since the plaintiff did not put on any evidence concerning his attorneys' fees in his case-in-chief before the discharge of the jury, he has waived any claim to attorneys' fees.

## Background

Before taking up the various legal issues posed by the defendants' Motion to Set Aside the Verdict, it is helpful for an understanding of the various issues to provide a short factual background of the case.

The decedent, Mr. Parker, who was eighty years old when he was placed into the Liberty House Nursing Home by his daughter and son-in-law in the belief that they would be able to contend with his problems of advancing Parkinson's Disease and other mental and physical difficulties that he was experiencing because of his age. During the course of Mr. Parker's stay at Liberty House, his daughter, Thelma Huffman and her husband, the Plaintiff, Eugene Huffman, became concerned as to the quality of care that Mr. Parker was receiving at the facility. Although they dealt extensively with the staff and the management, their concerns increased. Finally, on about January 21, 1992, they became extremely concerned that Mr. Parker was reporting aberrant sexual behavior and abusive physical behavior by at least one of the staff members. After Mr. and Mrs. Huffman confronted the staff with the various allegations concerning Mr. Spitzer, Mr. Spitzer was placed on suspension. Shortly thereafter, he was terminated by the corporate defendants. Mr. Parker remained a resident at Liberty House until March 5, 1992.

After Mr. Parker's removal from the facility, Mrs. Huffman arranged for her father to be diagnosed and treated and debriefed by a local psychiatrist, Dr. N. McLean-Rice. She also made a report to a local organization known as CASA (Citizens Against Sexual Assault) who assigned Heidi Weimer, one of their program directors, to work with Mr. Parker to see if they could help him deal with the apparent traumatic consequences of the treatment he received at the nursing home. The interview/counseling process with Mrs. Weimer went on for an extended period of time as did the consultations with Dr. McLean-Rice. Also at or about the time that Mr. Parker made his accusations, his daughter also notified the Harrisonburg Police Department who assigned Detective Sparts to the case. Detective Sparts and other law enforcement officials conducted an investigation concerning Mr. Parker's treatment at Liberty House.

Ultimately, Mr. Parker testified before a Grand Jury that was impaneled in Harrisonburg. After his testimony and that of other witnesses, the Grand Jury

on June 15, 1992, returned a nine-count felony indictment against Michael Spitzer charging him with four counts of forcible sodomy.(§·18.2-67.1(A)(2)), two counts of aggravated sexual battery (§ 18.2-67.3(A)(2)(b)), and three counts of assault and battery (§ 18.2-57) against William Parker while he was a patient at the Liberty House Nursing Home. On September 24, 1992, shortly after the.indictments were issued, Mr. Parker suffered a debilitating stroke which rendered him incapable of any speech or communication. Shortly thereafter, the Commonwealth moved an Order permitting the use of Mr. Parker's out-of-court statements at the criminal trial because he was "unavailable" because of his stroke. When this motion was denied on October 22, 1992, the Commonwealth moved for and was granted an order of nolle prosequi. Mr. Parker never regained the use of his faculties from the time of the stroke until he died on January 7, 1994.

I. *Defendants' Motion to Set Aside the Verdict Based Upon Inadmissible Hearsay Statements*

Defendants move to set aside the verdict because a number of statements, particularly those pertaining to the sexual and physical abuse by Michael Spitzer, which were made by Mr. Parker when he was alive to various individuals, including, but not limited to, his daughter, his son-in-law, his psychiatrist, the case worker from CASA, and Detective Sparts, were admitted into evidence pursuant to the provisions of § 8.01-397. of the Code (the so-called Dead Man's Statute). The basis of the attack by the Defendants on the admission of Mr. Parker's statements is two-fold. They first assert that § 8.01-397, even if it were applicable, requires that the statements of the deceased individual must have been made at a time while he was "capable." Defendants believe that at all pertinent times Mr. Parker was so demented that he was incapable of recalling basic facts and was incapable of distinguishing truth from fiction. The second argument offered by Defendants is that § 8.01-397 was not intended to cover situations such as are presented here and that the estate of a deceased person should not be able to recover based upon the out-of-court statements of the decedent.

Addressing the first issue, this Court conducted at the request of the Defendants a preliminary evidentiary hearing in which the Defendants called a Dr. James Levinson, a Board certified psychiatrist from the Medical College of Virginia, who testified that, although he had never met Mr. Parker, based upon his medical records and other evidence that he had reviewed, he.did not believe that Mr. Parker was "capable" at the relevant times of distinguishing truth .from fiction, and, therefore, was not "capable" of rendering reliable

testimony. After this evidentiary hearing, the Court concluded that there was a sufficient factual basis (particularly the contrary conclusions reached by Dr. McLean-Rice concerning the reliability of Mr. Parker's recall and articulation capabilities), that the statements were made while Mr. Parker was "capable" and should be permitted to go before the jury to be evaluated by them.

In fact, during the course of the trial, a number of individuals, including Dr. McLean-Rice, Mrs. Heidi Weimer, Dr. O. Douglas Smith (one of Mr. Parker's treating physicians), and numerous other individuals testified that during the relevant periods of time Mr. Parker did have problems with dementia but could frequently be in his own way articulate and could distinguish fact from fiction. In short, there was ample evidence in this record to establish that, although Mr. Parker may have been impaired in many ways, he was capable of relating to the individuals the statements which were admitted into evidence, and their reliability and weight were to be determined by the jury. Therefore, to the extent Defendants' motion is premised upon his incompetency to testify, it is denied.

The second basis of the Defendants' motion on this point is simply the assertion that § 8.01-397 of the Code does not apply to hearsay statements of a decedent whose administrator is bringing a suit to recover damages. This argument is contrary to the plain wording of the statute which provides that: "In any action by or against [a decedent], all ... declarations by the [deceased] ... may be received as evidence in all proceedings ...." Therefore, to the extent the Defendants' motion is based upon the mistaken belief that § 8.01-397 does not apply to a suit brought on behalf of a decedent, it is overruled.

The more pertinent issue, however, is that § 8.01-397 does provide that no judgment shall be entered for or against a deceased person on "uncorroborated" testimony. Therefore, the more appropriate question is whether there is sufficient corroborating evidence in the record to support a judgment in favor of the Plaintiff and against the Defendants. The law in Virginia has been consistent that the amount of corroboration required to support such a verdict need only be slight and need not prove every element of the cause of action. See, *e.g. Penn v. Manns,* 221 Va. 88 (1980); *Brooks v. Worthington,* 206 Va. 352 (1965); *Morrison v. Morrison,* 174 Va. 58 (1939); *Krikorian v. Dailey,* 171 Va. 16 (1938); *Cannon v. Cannon,* 158 Va. 12 (1932); and *Arwood v. Hills, Adm'r,* 135 Va. 235 (1923). There was substantial non-hearsay evidence which corroborated the general allegations of the inadequate level of treatment provided to Mr. Parker including unnecessary restraints, failure to protect him from leaving the building, permitting him to remain dirty, unbathed, and in his own urine for inappropriate lengths of time, and being force fed. This evidence came in

through a number of eyewitnesses who observed the condition of Mr. Parker and the treatment he received.

There was non-hearsay testimony providing corroborating evidence to support the verdict on behalf of Mr. Parker's estate in that there was physical evidence of unexplained bruising upon Mr. Parker, and there was evidence of numerous small cuts to his face which clearly appeared to be beyond the normal amount of nicks incurred by any individual who was being shaved. All of this evidence would tend to corroborate the statements made by Mr. Parker which were admitted into evidence. It is true, however, that the core allegations concerning the sexually abusive conduct by Mr. Spitzer are supported almost wholly upon the out-of-court statements of Mr. Parker. While some of this testimony may have been admitted under various exceptions to the hearsay rule, there nevertheless needs to be some corroboration of this evidence in order to support a verdict.

Corroboration of Mr. Parker's out-of-court statements relating to the sexually motivated assaults by Mr. Spitzer was provided by the in court testimony of Keith Kroll, a wheelchair bound individual suffering from cerebral palsy, who testified that Michael Spitzer had sexually molested him while he was a resident of Liberty House and that he reported that fact to Mr. Spitzer's supervisors and nothing was done about it. Mr. Kroll also testified that he saw Spitzer "force feed" other patients.

Additionally, there appears to be strong scientific corroboration of the statements of the sexual abuse of Mr. Parker by the diagnosis of Dr. McLean-Rice. The jury was presented with extensive testimony from Dr. McLean-Rice that the characteristic behavior of Mr. Parker when he was being interviewed, diagnosed, and treated was that of an individual suffering a post-traumatic stress reaction secondary to sexually abusive conduct. Although it is clear that psychiatric diagnoses and analysis is not necessarily an "objective" science, it certainly is some corroborating evidence of the statements of Mr. Parker and is able to satisfy the corroboration requirements set forth in Code § 8.01-397. Therefore, the Motion to Set Aside the Verdict on the basis of § 8.01-397 is denied.

## II. *Defendants' Motion to Set Aside the Punitive Damage Award Against the Corporate Defendants*

The Corporate Defendants rely upon the holding in *Hogg v. Plant*, 145 Va. 175 (1926), for the proposition that punitive damages cannot be awarded against a corporation for the acts of its agents which are outside the scope of

their authority and which the corporation did not authorize or ratify. The Supreme Court's statement in *Hogg v. Plant* is precise and to the point:

> It must be considered as the settled law of this state that punitive damages cannot be awarded against a master or principal for the wrongful act of his servant or agent in which he did not participate and which he did not authorize or ratify.

Although this may be a perfectly valid statement of the applicable law, it does not deal with the situation that was presented in this case. First, the same lawyers represented Michael Spitzer and all of the Corporate Defendants. They never took the position in the trial that Mr. Spitzer's acts were beyond the scope of his authority or had not been ratified by the corporation, but insisted that the position of all of the defendants in the case was that the acts of abuse did not occur. Secondly, punitive damages have been awarded against the corporation for many acts which did not necessarily involve Michael Spitzer. For example, there was repeated evidence concerning the unnecessary use of physical restraints, the force feeding of Mr. Parker, the failure to remove Mr. Parker from sitting in his own urine and feces, and similar other conduct which implicated other members of the corporate staff and Mr. Spitzer.

Also, the Defendants do not take into account the fact that there was also a negligent hiring and retention claim in the case and that the evidence presented by the Plaintiff in the case and which was permitted to go to the jury was that the Corporate Defendants had failed to check any of Mr. Spitzer's references before he was employed and that such references would have disclosed aberrant behavior at his prior nursing home employment. Secondly, there is also evidence that the agents of the Corporate Defendant had knowledge of Mr. Spitzer's sexually molesting another resident, Keith Kroll, and took no steps to remove or discipline Mr. Spitzer. In short, there was ample evidence that the jury could consider in making a determination that acts of the Corporate Defendants were willful, wanton, and in complete disregard of the rights of Mr. Parker. Therefore, the Motion to Set Aside the Verdict of Punitive Damages Against the Corporate Defendants is denied.

III. *Defendants' Motion to Reduce Punitive Damages to $350,000.00*

The provisions of § 8.01-38.1 of the Code of Virginia are clear and are explicit and have been repeatedly upheld by the Federal Courts and inferentially by the Supreme Court of Virginia. See, *Wackenhut Applied*

*Technologies v. Sygnetron*, 979 F.2d 980 (4th Cir. 1992); see also *Etheridge v. Medical Ctr. Hosps.*, 237 Va. 87 (1989).

The Plaintiff's response to this motion is a broadside attack against the constitutionality of the Virginia statutory cap on punitive damages. It ranges from an allegation that the punitive damage cap violates the United States Constitution to the fact that the punitive damage cap violates the separation of powers doctrine, the equal protection clause of the United States and Virginia Constitutions, and the fact that the punitive damage cap should not be applied in this case because the Defendants allegedly used a fraudulent corporation in an unsuccessful attempt to shield themselves from liability.

Although the Plaintiff makes every argument that could be made to challenge the cap and cites a number of non-Virginia authorities in support of his position, it is the position of this Court that the punitive damages cap set forth in § 8.01-38.1 is constitutional and valid, and it requires the Court to reduce the amount of total punitive damages awarded in this case to $350,000.00. Therefore, the punitive damage award will be so reduced.

## IV. *Defendants' Motion for a Mistrial Based Upon Comments on the Evidence*

The Defendants allege that a comment made by the Court during the course of this jury trial, which consists of over two thousand pages of trial transcript, prejudiced their case to the extent that a mistrial is warranted. At page 835 of the transcript, the Court, in response to argument presented on an objection to questions being asked by Defendants' counsel stated:

> There is no evidence there was any incident involving anyone named "Skinny." There's no evidence of the incident in the Army related in any way to sexual abuse or sexual perversion. The testimony has been consistent here that the only person this gentlemen allegedly referred to as "Skinny" was the Defendant, Michael Spitzer.

Immediately after this statement (at page 836) defense counsel objected to the Court's comment as not being appropriate. A side-bar conference then ensued concerning what the evidence had been in the case and the Court stated at the side-bar that it would give a cautionary instruction.

The Court then returned to the record and immediately gave the following cautionary instruction to the jury (at transcript 837):

> The Court: Ladies and gentlemen of the jury, any comment that I may have made that may be interpreted to be a comment on the evidence

and the response to something by counsel should be disregarded by you. You are the sole determiners of what the evidence in this case has shown and proven. Thank you.

At the beginning of the trial, the Court gave the following cautionary instruction to the jury (at Tr. 116):

> No statement, ruling, or remark I may make during the course of the trial is intended to indicate my opinion as to what the facts are. It is the function of the jury to consider the evidence and determine the facts in this case.

The Court is of the opinion that the comments it made were not prejudicial to the defendants and that to the extent any prejudice could theoretically have been created, it was cured by the immediate cautionary instruction given to the jury and by the general instruction given to the jury at the beginning of the trial.

Therefore, Defendants' Motion to Set Aside the Verdict Because of the Court's Comments on the Evidence is denied.

## V. *Defendants' Motion to Set Aside the Verdict is Based Upon Inadmissible Evidence of the Defendant Michael Spitzer's Sexual Orientation*

The allegations in this lawsuit that related to sexual abuse of Mr. Parker related to acts of oral and anal sodomy allegedly committed upon Mr. Parker by Mr. Spitzer while Mr. Spitzer was providing geriatric care for Mr. Parker at the Liberty House Nursing Home. While it is clear that the sexual orientation of a party or a witness in civil or criminal litigation is normally absolutely irrelevant to any issue in a trial, there is no hard and fast rule in Virginia mandating that evidence concerning an individual's sexual orientation is *never* admissible into evidence. In certain cases in the Commonwealth of Virginia, where because of the unique fact pattern, the sexual orientation of a party or witness was relevant and such evidence has been admitted. See, *e.g.*, *Moore v. Commonwealth*, 222 Va. 72 (1981); *Kirk v. Commonwealth*, 21 Va. App. 291 (1995). Jurisdictions outside of Virginia have also, under limited circumstances, approved of the admission of evidence relating to the sexual orientation of a party. See, e.g., *Wilcoxen v. State*, 162 Ga. App. 800, 292 S.E.2d 905 (1982); *Davis v. State*, 396 S.E.2d 301 (Ga. App. 1990).

Therefore, the decision of the Court of whether evidence of sexual orientation should be admitted needs to be analyzed in terms of whether the

evidence is relevant and whether its probity outweighs any prejudicial value. The general rule in Virginia is that "any fact, however remote, that tends to establish the probability or improbability of a fact in issue is admissible." *Horne v. Milgrim*, 226 Va. 133 (1983). Given the fact that some jurors may find that the sexual activity of which Michael Spitzer is charged perpetrating upon Mr. Parker would be very unlikely because of a perceived notion that one male would not engage in such sexual conduct with another male, the Georgia Court of Appeals in *Wilcoxen v. State*, 292 S.E.2d 905 (Ga. App. 1982), decided:

> Exceptions to the general rules governing the conditions under which evidence of other crimes is admissible to show plan, motive and intent have been applied in sex cases, the reason being that a tendency toward sexual deviancy, if relevant to the crime for which the defendant is on trial, is admissible because it is out of the ordinary in that it supplies a motive and makes credible what would otherwise be difficult of belief. *Id.* at 907.

The fact of Mr. Spitzer's homosexuality could be considered by the jury in this case as some evidence that "tends to cast any light" upon the material issues in the case. See, e.g., *McNeir v. Green-Hale Chinchilla Ranch*, 194 Va. 623 (1953). The Court, therefore, has determined that this evidence was relevant and was suitable to be submitted to the jury. Therefore, Defendants' Motion to Set Aside the Verdict because the Plaintiff was allowed to bring out in cross-examination Mr. Spitzer's sexual orientation is denied.

## VI. *Defendants' Motion to Set Aside the Verdict to the Extent Based Upon Inadmissible Evidence of Prior Bad Acts*

Although there was a substantial amount of evidence introduced at the trial concerning the aberrant behavior of Mr. Spitzer at his prior place of employment and during his tenure at the Liberty House Nursing Home, all of this evidence was admissible under the generally accepted principles that prior bad acts can be introduced to show the conduct and feeling of the accused towards his victim, to prove opportunity for the commission of the offenses charged, and to demonstrate a common plan or scheme where these bad acts show a certain pattern. See, e.g., *Sutphin v. Commonwealth*, 1 Va. App. 241 (1985). In addition, a number of these so-called "bad acts" were merely evidence that demonstrated the behavior of Michael Spitzer that either was actually known to his supervisors and the management of the Corporate

Defendants and/or conduct which should have been known if they had made an appropriate check of his references before hiring him. Therefore, this evidence was admissible to prove the liability of the Corporate Defendants for the negligent hiring and retention of Mr. Spitzer.

Therefore, the Motion of the Defendant to Set Aside the Verdict because of this evidence is denied.

*VII. Defendants' Motion to Set Aside the Verdict as Based Upon Evidence Inadmissible Under Virginia Code § 8.01-401.1*

Defendants move to set aside the verdict because they allege that Dr. McLean-Rice was permitted to "read" from a medical treatise and that the Defendants had not been provided the thirty-day notice required by § 8.01-401.1 of the Code of Virginia. The incident that is referred to by the Defendants was during the testimony of Dr. McLean-Rice. When he was describing the symptoms of post-traumatic stress disorder, he was asked on direct whether such a diagnosis had criteria which was set out in an authority recognized by him and by the Defendants' expert Dr. Levinson as an authoritative source in the field of psychiatry known as the *Diagnostic Statistics Manual.* Dr. McLean-Rice responded that the manual did contain a two and a half page definition of the criteria for a post-traumatic stress disorder diagnosis.

However, a complete review of the record (Transcript, pp. 951-975) shows that Dr. McLean-Rice quoted exactly two words from the manual, *i.e.*, "A person," before he went off on his own explanation of what the criteria were and how they were applied in this case. In short, there was no significant or substantial reading from any learned treatise in violation of the procedural rules of § 8.01-401.1; therefore, the Defendants' Motion to Set Aside the Verdict under this statute is denied.

*VIII. Defendants' Motion to Set Aside the Verdict as Based Upon Inadmissible Incident Reports Under Virginia Code § 8.01-581.16 and § 8.01-581.17*

Throughout the extensive pretrial proceedings in this case, the Defendants had consistently taken the position that all incident reports which were filed concerning any accident or mishap at their facilities were protected by the privileges set forth in this statute as being reports which were prepared for a quality assurance review procedure. The evidence that was adduced at pretrial and the evidence that was apparent from the face of the documents referred to is that the Liberty House Nursing Home and its corporate parents, the Beverly

Defendants, had a procedure whereby virtually all of the day-to-day reporting of small incidents that occurred, such as injuries to the inhabitants or slips and falls which occurred in the nursing home, were reported on a form which was eventually provided to a quality assurance panel. These reports do not contain any deliberative processes of the quality assurance panel or any recommendations concerning remedies that are to be instituted or new procedures that are to be adopted.

It has been this Court's position, and other Courts' which have dealt with this issue (see, e.g., *Roadcap v. Beverly Enterprises, Inc., et al.*, (No. 10078 Rockingham Circuit Court) (Hupp, J.); *Benedict v. Community Hospital*, 10 Va. Cir. 430 (1988) (Coulter, J.)), that these type documents are not shielded from discovery nor are they precluded from being admitted into evidence simply because they may be marked as ultimately destined for a quality review committee or panel. The fact of the matter is these are simple, factual reports made by the staff concerning incidents which occurred at the home. As such, they certainly do not rise to the level, as contemplated by the statute, of being quality assurance or deliberative type documents. They are much more akin and they can be considered more akin to ordinary hospital records, which are specifically exempted from the provisions of § 8.01-581.17. The statute provides in pertinent part that:

> Nothing in this section shall be construed as providing any privilege to hospital medical records kept with respect to any patient in the ordinary course of business of operating a hospital nor to any facts or information contained in such records, nor shall this section preclude or affect discovery of or production of evidence relating to hospitalization or treatment of any patient in the ordinary course of hospitalization of such patient.

Although the above-cited provision of § 8.01-581.17 does not specifically refer to nursing homes, it is this Court's view that this provision clearly covers nursing home records which would be analogous to similar records maintained by a hospital concerning a patient.

As stated by the Court in *Benedict*:

> The argument that all field work, the incident reports, the questions concerning falls that might precede a peer review meeting should be free from discovery … must yield to the more compelling mandate of the statute's last sentence. Otherwise, all documents could become privileged simply by the committee requiring their production or

attaching them to the minutes. As stated in *Johnson*: "Almost anything could come within such broad and limitless sweep." *Id.* at p. 436.

Therefore, the Defendants' Motion to Set Aside the Verdict based upon evidence which was admitted in alleged violation of § 8.01-581.17 is denied.

*IX. Motion to Set Aside the Verdict Based on Insufficient Evidence of Medical Negligence*

The Defendants relying upon *Raines v. Lutz*, 231 Va. 110 (1986), take the position that there was insufficient evidence of medical negligence upon which a verdict could be entered against them. First of all, there was expert testimony offered by the plaintiff from a nursing home administrator concerning the standard of care applicable in Virginia to nursing homes and testimony that the Corporate Defendants breached this standard of care. That standing alone is a sufficient basis upon which a verdict could be rendered against the Defendants on the grounds of negligence in providing an appropriate standard of nursing home care.

In addition, there is a well accepted principle in Virginia that there need not be expert testimony concerning the violation of a health care provider's standard of care if the alleged acts of malpractice fall within the jury's common knowledge. See, e.g., *Jefferson Hospital, Inc. v. Van Lear*, 186 Va. 74 (1947), and *Beverly Enterprises, Inc. v. Nichols*, 247 Va. 264 (1994). In light of these cases, it is clear that a number of the alleged acts of malpractice against these defendants involved things that are so patently and obviously beyond the arguable standard of care that a jury would be perfectly capable of determining that the defendants had committed malpractice without any expert testimony to assist them. Therefore, the Defendants' Motion to Set Aside the Verdict for insufficient evidence of malpractice of the nursing home is denied.

*X. Defendants' Motion to Set Aside the Plaintiff's Breach of Contract Claim and Plaintiff's Motion for an Award of Attorneys' Fees*

The issue of the contract claim which was submitted to the jury and the Plaintiff's request for an allowance of attorneys' fees are so closely related that they will be discussed together. In short, the Defendants assert (1) that the contract claim never should have been submitted to the jury and (2) that even if the contract claim was validly submitted to the jury, that the Plaintiff has waived any claim to attorneys' fees because he failed to present evidence

before the jury as to the quantum and reasonableness of his attorneys' fees. The Defendants' position is not well taken on either count.

First, a fair reading of the Supreme Court's decision in *Glisson v. Loxley*, 235 Va. 62 (1988), is that a medical malpractice action may be premised on both contract and/or tort so long as the claim under contract includes something in addition to and greater than the duty of care implied in a tort action. In this case, the contract entered into between the Defendant corporations and Mr. Parker through the holder of his power of attorney involved a number of obligations assumed by the nursing home in addition to those that would be implied by a tort cause of action for nursing home malpractice. (See, e.g., Plaintiff's Exhibit 8, pp. 1-10.) For example, the contract entered into by the parties specifically provided in Section 8 that if the facility is "certified by the Medicare or Medicaid Programs" (and there was evidence that it was certified by both programs), the facility shall provide the beneficiaries with all services required to be provided by state and/or federal law. The testimony at the trial was that the Virginia standard of care for nursing homes essentially incorporates and parallels the various provisions required under the Medicare and Medicaid regulations. Thus, the Corporate Defendants have contractually obligated themselves to provide these services. Probably the most significant item in the contract, however, which is not contained in a standard tort action for nursing home malpractice is the provision in Plaintiff's Exhibit 8 at page 8 (Section XVI-B) which reads as follows:

> *Attorneys' Fees.* If a legal action is commenced by any party to this agreement, including any disputes arising from the agreement, the prevailing party shall be entitled to recover his or her reasonable costs including reasonable attorneys' fees incurred in defending or prosecuting such action.

Thus, the contract clearly provides a contractually agreed upon shifting of the costs of litigation arising out of the contract and/or out of a patient's stay at the covered facility. Given that this is clearly an obligation above and beyond that implied in a tort action, it standing alone would provide a basis for a contract claim to be submitted to the jury.

Therefore, the Plaintiff's claim that the contract claim should not have been submitted to the jury because the contract claim was merely the mirror image of the tort cause of action is denied.

The Plaintiff has, in accordance with the above quoted provision of the contract, submitted a motion on October 3, 1996, requesting an allowance of

attorneys' fees and litigation costs. The Corporate Defendants have opposed this on the grounds that a question of the reasonableness of attorneys' fees is a fact question that a jury must decide and since the evidence was not presented to the jury, the Plaintiff has waived any claim for this element of recovery.

It is clear in the early cases in Virginia that the question of reasonable attorneys' fees may be decided by a jury. See *Conway v. American National Bank*, 146 Va. 357 (1926); *Cox v. Hagan*, 125 Va. 656 (1919). The more recent cases concerning the appropriate method of determining the reasonable amount of attorneys' fees do not address the question of whether or not this matter must be submitted to a jury and if so, if it need be the same jury that decided the underlying issue of liability. See, e.g., *Mullins v. Richlands National Bank*, 241 Va. 447 (1991) (a non-jury trial); *Beale v. King*, 204 Va. 443 (1963) (a non-jury trial); *Rappold v. Indiana Lumbermen's Mut. Ins. Co.*, 246 Va. 10 (1993) (a non-jury trial).

Although this issue is not discussed at length in any reported Virginia case, the Court is of the view that the more reasoned approach to the determination of disputed attorneys' fees is set forth in the recent case of *Tazewell Oil Co. v. United Va. Bank/Crestar Bank*, 243 Va. 94 (1992). In that case, there was a jury trial on a multiple count motion for judgment for compensatory and punitive damages under § 18.2-500 of the Code of Virginia. In that case, the Court sent to the jury the question concerning the compensatory and punitive damages issues. After the jury returned a verdict in favor of the plaintiff, the Court then took evidence concerning the appropriate amount of attorneys' fees. The Supreme Court discussed the procedure as follows:

> Where, as here, a statute authorizes recovery of attorneys' fees and expenses, the fact finder is required to determine from the evidence the amount of the reasonable fees under the facts and circumstances of each particular case. *Mullins v. Richlands National Bank*, 241 Va. 447 (1991). "In determining a reasonable attorney's fee, the fact finder should consider such circumstances as the time consumed, the effort expended, the nature of the services rendered and other attending circumstances." *Id.* While expert testimony ordinarily is necessary to assist the fact finder, such testimony is not required in every case. See *Id.* In this case, expert testimony was not necessary because of the affidavits and detailed time records which were wholly unrefuted by any evidence offered by UVB. *Accordingly, we hold that the amount fixed by the trial court was amply supported by the*

*evidence and we find no error in the trial court's allowance.* [Emphasis added.] *Id.* at 111-12.

In complex litigation it is self evident that this is the only procedure which is suitable for an orderly submission of evidence. Obviously the best evidence (and probably the only admissible evidence) of the amount of time put in by the Plaintiff's attorneys and what was done during that time are the Plaintiff's attorneys themselves. It would be impossible to have an orderly trial, if at the closing of the trial, the attorneys for the plaintiff would need to be disqualified from the case so that they could testify in the proceeding. This would give rise to untold confusion on the part of the jury and be unnecessarily disruptive of the litigation process.

The Court believes that the appropriate procedure to be followed and the one that will be followed here and which is inferentially recognized in the Supreme Court's opinion in *Conway v. American National Bank,* 146 Va. 357 (1926), is for the Plaintiff to now submit a detailed claim for his attorneys' fees with all supporting documentation and receipts together with affidavits of expert witnesses attesting to the reasonableness of the charges. After these have been submitted to the Court, the Corporate Defendants will have twenty-one days in which to file any objections under oath they care to file concerning the quantum of fees. If there is a dispute at that time as to the amount of the fees, the reasonableness of the fees, or any other factual issues, the Court will then consider empaneling a new jury for the purposes of making the factual determination desired by the Defendants.

The Plaintiff is directed to file a detailed claim for attorneys' fees and costs with supporting affidavits on or before May 23, 1997. The Corporate Defendants are directed to file any objection to this claim, together with supporting affidavits, on or before June 16, 1997.

The Plaintiff's counsel are directed to prepare a trial order incorporating this opinion. The order to be prepared is not a final order and it will note that the cause is continued for the submission of evidence material to attorneys' fees and further proceedings to determine the quantum of attorneys' fees. After determination of the appropriate amount of attorneys' fees and costs to be awarded Plaintiff, a final trial order will be entered in the case.